IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 8, 2021

**STATE OF TENNESSEE v. GABRIEL STORM DAVIS**

**Appeal from the Circuit Court for Marshall County**
**No. 17-CR-103      M. Wyatt Burk, Judge**
_____

**No. M2020-00431-CCA-R3-CD**
_____

Defendant, Gabriel Storm Davis, was convicted by a jury of one count of aggravated child abuse and one count of aggravated child neglect. The trial court imposed an effective twenty-two-year sentence, as a Range I standard offender, to be served at 100 percent, by operation of law, in the Department of Correction. On appeal, Defendant argues: that the evidence was insufficient to support his convictions; that the State's election of offenses was insufficient to ensure a unanimous verdict; and that the trial court erred by admitting the victim's forensic interview into evidence. Following our review of the entire record and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P.3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

L. Samuel Patterson (on appeal), Columbia, Tennessee, and Jonathan C. Brown (at trial), Fayetteville, Tennessee, for the appellant, Gabriel Storm Davis.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Robert Carter, District Attorney General; and Drew Wright and William Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**Factual and Procedural Background**

*State's Proof*

This case arises from injuries inflicted on the three-year-old victim, Defendant's step-son, consisting of two skull fractures, a liver hematoma, and multiple broken bones in various stages of healing. A Marshall County grand jury indicted Defendant for one count

of aggravated child abuse and one count of aggravated child neglect. At Defendant's trial on these charges, Detective Tony Nichols of the Marshall County Sheriff's Office testified that on March 19, 2017, he received a call from an employee of the Department of Children's Services (DCS) advising him of a child at Vanderbilt Children's Hospital with serious injuries. Detective Nichols then began an investigation by traveling to the hospital in Nashville to meet with the three-year-old victim. Detective Nichols testified that the victim had been in the hospital for two days, had a severe black eye, and was wearing a neck brace and monitors when he saw the victim. Detective Nichols also noticed that the victim had scratches and bruises and a "busted" lip. He spoke to the victim's mother and Defendant at the hospital.

Defendant told Detective Nichols that the victim was injured at their residence in Spring Hill. Defendant gave Detective Nichols a written statement indicating that the victim stepped up on the back of a ride-on toy firetruck and that the toy flipped causing the victim to strike his head on a large rock near the front porch. Defendant told Detective Nichols that the victim complained of a headache and Defendant gave the victim some Tylenol. He and the victim's mother later transported the victim to Vanderbilt Children's Hospital after noticing that the back of the victim's head was swelling. Defendant also told Detective Nichols that approximately a week-and-a-half before that incident, the victim slipped and fell on some loose gravel while running down the porch steps and hit his eye on a large rock. Defendant stated that he gave the victim Tylenol for that injury as well. Defendant told Detective Nichols that a DCS worker had asked him about the victim having a healing leg fracture, and a doctor informed Defendant that the victim had a healing collar bone fracture and a lacerated liver. Defendant asserted in his statement that the victim's lacerated liver could have occurred when he, his daughter, and the victim fell down a steep hill toward the creek in their backyard. He also said that the victim and his step-sister were running down the hallway. Defendant noted that the victim never complained of any pain.

Detective Nichols was not satisfied with the answers Defendant gave concerning the victim's injuries, and a forensic interview was conducted with the victim on March 24, 2017. Detective Nichols observed the interview but did not participate. As a result of his investigation, Detective Nichols charged Defendant with aggravated child abuse and aggravated child neglect, and the victim was placed in the custody of Defendant's mother and step-father. Detective Nichols noted that the victim lived with his biological father in California at the time of trial.

On cross-examination, Detective Nichols agreed that both Defendant and the victim's mother appeared upset during his interview, and their statements were similar. He testified that the victim told him that he got a lot of "owies." He said the victim indicated that he frequently hurt himself and "got in trouble when he hurt himself." Detective Nichols testified that he visited the residence on Reynolds Drive, and Defendant and the victim's mother showed him the fire truck that the victim climbed on and flipped over as

well as the area where the victim fell from the porch. He also observed the creek bank and agreed that it was a "pretty good slope" that a three or five-year-old child could have difficulty walking up or down without help. Detective Nichols photographed the areas Defendant and the victim's mother showed him.

Sydni Turner, a forensic interviewer with the Exchange Club, Carl Perkins Center for the Prevention of Child Abuse, testified as an expert in the "field of forensic interviewing, specifically, children." She interviewed the victim on the morning of March 24, 2017. The video of the interview was played for the jury. Ms. Turner noted that the victim had a very large mark on his eye at the time. During the forensic interview, the victim said that he had been coughing, and he vomited that morning. The victim told Ms. Turner that on one occasion, Defendant spanked him (with Defendant's hand) and made him sit in the corner because the victim said that he smoked. The victim said that the spanking hurt and also hurt his feelings.

During the forensic interview, the victim told Ms. Turner that he had been to a doctor's office, where he vomited, because he hurt himself and had "owies." He said that the "owie" on his arm was hurting at the time, and he was crying. The victim denied having any other injuries at the doctor's office. The victim told Ms. Turner that he injured his eye while swinging a toy gun. He said that Defendant kicked him in the eye with his "feet" because the victim had hit himself with the toy. The victim indicated that he was in the toy room with Defendant at the time, and the victim's mother was asleep. Defendant told him "to not take toys up." The victim said that Defendant did not do anything else to him, and the victim had no other "owies." He did not tell anyone that Defendant kicked him.

In the interview, the victim told Ms. Turner that his head hurt because he had a big "owie." He said that he had a big bruise on his head from falling on a toy fire truck that was parked on the road. He further said that he was outside of the toy truck when he fell. The victim reported that his mother and Defendant saw him fall and helped him up. The victim said that he got "owies" when he hurt himself and that no one else hurt him. He also said that he hurt himself with a toy. The victim told Ms. Turner that the grown-ups he trusted included Defendant and the victim's mother.

On cross-examination at trial, Ms. Turner testified that although the victim mentioned during the interview that he had been sick and vomiting, he did not appear to be in any pain or discomfort during the interview. The victim talked about having "owies," but Ms. Turner was not aware that victim had any self-harming issues.

The victim's mother testified that she and Defendant were no longer married and that she had been charged along with Defendant in this case. Her charges were still pending at the time of trial. She said that she had not been promised anything in exchange for her testimony. The victim's mother testified that on March 17, 2017, while at work, she received a text message from Defendant stating that the victim had fallen. She said

Defendant indicated that he gave the victim some Tylenol and an ice pack, that the victim was watching television, and that she did not need to leave work.

When the victim's mother arrived home from work, she noticed that the victim was wearing a toboggan, and she discovered that his head was swollen. She also noticed that the victim "was a little out of it," and she told Defendant that they needed to take the victim to a hospital because he was "not acting normal." The victim's mother testified:

> On the way to the hospital, [Defendant] had told me that if we tell the doctors that we were both there, it would be something that they wouldn't think as something they would take the kids away. So if two people had saw what had happened, then they wouldn't take the kids and wouldn't suspect.

The victim's mother testified that she had no idea at that point how the victim's injury occurred other than what Defendant told her. When they arrived at TriStar Hospital in Spring Hill, she told hospital staff that she and Defendant were sitting on the porch when the victim fell off the back of a toy fire truck and hit his head on the stepping stones in front of the house.

After the victim was transferred to Vanderbilt Children's Hospital, the victim's mother gave a statement to Detective Nichols and told him that she was present when the victim received a black eye from a fall on March 8, 2017, and when he fell from the fire truck on March 17, 2017. She told Detective Nichols that one of the doctors at Vanderbilt also asked her about a healing collar bone fracture on the victim. She stated to Detective Nichols that "about a month or a month-and-a-half ago, [Defendant] was taking [the victim] out of his car seat, and he said his shoulder hurt. [The victim] never said anything to me about his shoulder hurting." The victim's mother told Detective Nichols that Defendant informed her that a DCS worker also asked him about a healing injury to the victim's leg and a lacerated liver. She said in her statement that she had no idea how those injuries occurred.

The victim's mother testified at trial that she did not witness either of the falls on March 8 or March 17, 2017. She noted that Defendant told the doctor at Vanderbilt that the only way the victim could have injured his liver was when he and the victim fell down a creek bank. The victim's mother gave a second statement to Detective Nichols a few months later, after she had been charged, and told him that she was actually at work on March 17, 2017, when the victim was injured. Concerning the black eye that the victim had received on March 8, 2017, the victim's mother told Detective Nichols that Defendant texted her that day and said that the victim had fallen off the porch. When the victim's mother arrived home from work, she saw that the victim had a "very bad black eye."

The victim's mother testified that at the time of the victim's injuries, Defendant had quit a job working with his father, and she had gone back to work so they would have some income. She said that Defendant stayed home with the victim and Defendant's daughter, who was approximately four months younger than the victim. The victim's mother also told Detective Nichols:

> [Defendant's daughter] is very rowdy and clumsy but she never got hurt like [the victim]. [Defendant] just said that she was different than [the victim] and didn't bruise as easily. After March 17 of 2017, every time [Defendant] would talk about [the victim], he always told me to say that I was at home when [the victim] got his black eye and when he fell off the fire truck or they would take the kids away. And if I changed my story, we would never get the kids back.

The victim's mother agreed that her two statements had inconsistencies and that her statement was different than Defendant's as to how the victim fell when he received the black eye.

The victim's mother also testified concerning an injury that the victim received in December 2016. She was at work when Defendant texted her and said that the victim had jumped off the couch in the toy room and struck his head on the edge of a high chair. The victim's mother asked Defendant if she needed to come home, and he said, "no." When she later arrived home, the victim's mother noticed that the victim's head was a little swollen but he was talking, eating, and acting normal. The next morning, the swelling was worse, and "had gone down into his face and bruising had set in." The victim's mother testified that she and Defendant took the victim to the hospital. She said that the victim later had a follow-up appointment with a neurologist during which time the victim was acting happy and completely normal. She said that the victim never complained of any other injuries. The victim's mother testified that Defendant was the only person other than herself who watched the victim from December 2016 until March 2017.

On cross-examination, the victim's mother agreed that the victim was very active and climbed on furniture and toys. She said that the victim was not a clumsy child, and she noted that he was a "typical three-year-old child" who liked martial arts movies. He sometimes demonstrated martial arts moves. The victim's mother agreed that the victim's injury in December 2016 was "ruled an accident[.]" She said that the victim's eye was still bruised from the injury at the time of his follow-up appointment in March 2017. The victim's mother testified that she never saw the victim self-harming by hitting himself with toys or banging his head against the wall during "time-out." She agreed that the victim had toy guns and action figures with which he enjoyed playing. The victim's mother said that she usually disciplined the victim by placing him in time-out or spanking him. The victim's mother testified that the victim and his step-sister sometimes wrestled and used martial arts moves, but they did not hit one another. The victim's mother agreed that she lied to

Detective Nichols in her first statement and waited more than four months, after being charged with a crime, before changing her statement. She said that she did not notice anything unusual from December 2016 until March 2017 when she bathed the victim and he did not complain of any pain.

On redirect examination, the victim's mother agreed that she was not present for any of the victim's falls, and she did not know if he actually fell. She only knew what Defendant had told her.

The victim, who was six years old at the time of trial, remembered going to the hospital because he got hurt. He said that Defendant punched and kicked him a lot because Defendant got mad at him for "doing bad stuff." He said that Defendant beat him up "really bad." The victim testified that Defendant punched or kicked him in the stomach "like five times." He did not recall any injuries to his head or other parts of his body. The victim remembered that Defendant placed his hand over the victim's mouth causing pain because the victim was "getting in trouble a lot." He also remembered going to the hospital due to a black eye and that he received the black eye because Defendant was "punching [him] a lot." The victim testified that he did not tell his mother about Defendant punching him because "it would make her mad."

On cross-examination, the victim testified that at the time of trial he lived in California with his father, his father's fiancée, and his sister. He watched Kung Fu Panda and wrestling on his tablet. He also had Black Panther action figures, but he never hit himself with them. He did not recall playing in a creek when he lived with Defendant and his mother. He said that he did not jump off the couch or off his toys. The victim testified that he remembered talking to "Ms. Sydni" and telling her that he hurt himself a lot, and he agreed what he told "Ms. Sydni" differed from his trial testimony. He did not recall Defendant or his mother giving him Tylenol. The victim also did not remember talking to any doctors or nurses when he lived in Tennessee. The victim testified that he and his father discussed the trial and his testimony but he did not remember what his father told him.

On redirect examination, the victim testified that he spoke with his father and the prosecutor about testifying. They brought him to see the courtroom so that he would not be nervous and anxious about testifying. The victim agreed that his father and the prosecutor told him to tell the truth during his testimony.

The victim's father testified that he lived with the victim and the victim's mother in California before she left with the victim and moved to Tennessee. He gained custody of the victim after Defendant's parents contacted him through Facebook. The victim's father testified that the victim was initially "like a scared puppy" and "very reserved . . . when it came to body language and loud sounds." The victim's father further testified:

. . . I still can't raise my voice to him. He gets really scared and breaks down. So, I, we just put him in time out. We explain to him and just talk to him and let him know what he's doing and why he can't do it, and then he's got to go sit in time out for how old he is. That's what his therapist recommends, so now it will be six minutes.

The victim's father noted that the victim was still seeing a therapist and that he also saw a neurologist yearly. He said that the victim had a "tic in his hand that has a little shake." The victim's father testified that he and the victim discussed testifying in court, and they discussed the difference between right and wrong. He did not try to tell the victim what to say.

On cross-examination, the victim's father testified that he usually disciplined the victim by placing him in time-out, and he sometimes raised his voice to the victim; however, he never spanked him. The victim's father testified that the victim would sometimes lie about silly or extreme stories. For example, the victim once told him he went swimming with a great white shark. The victim's father testified that he had never punished the victim for lying and that the victim also told the truth as well. The victim's father testified that the victim had many action figures at home. He had never seen the victim hitting himself with the action figures, but he had witnessed the victim banging them together.

The victim's father testified that the victim had watched martial arts movies, and he liked wrestling. He said that the victim liked to demonstrate martial arts and wrestling moves and liked to climb and jump off things. The victim's father testified that the victim had gotten hurt jumping from things but had not hit his head on any of those occasions. He said that the victim "lands real hard down on his feet and then plants his hands down." The victim's father testified that the victim had recently begun hitting his head against the wall when placed in time-out. He told the victim to stop because he was concerned about the previous head injuries. He had not witnessed the victim harming himself in any other way. When asked if the victim was sometimes aggressive toward his sister, the victim's father said, "Yeah, they're brother and sister. They fight." He said that the victim only grabbed his sister but did not hit her. The victim's father testified that the victim would "whine" when he wanted attention.

The victim's father testified that he and the victim discussed the case daily, but they did not discuss the victim's testimony, and he did not tell the victim what to say. He said they discussed "the process of him having to come here and be brave and tell the truth."

Carrie Donnell, a pediatric nurse practitioner at Vanderbilt Children's Hospital, testified as an expert in the field of "pediatric medical evaluation of abuse and neglect[.]" She testified that she was a member of the Child Abuse Response Evaluation (CARE) Team, a "consultative service that is involved to provide medical evaluations when there

is a suspicion, when a child presents to our institution with suspicion for child abuse and/or neglect."

Ms. Donnell testified that as a member of the CARE Team, she evaluated the victim once he was transferred to Vanderbilt Children's Hospital. She reviewed his medical records prior to visiting him. Ms. Donnell said that the victim had a "skull fracture and an underlying subdural hemorrhage, which is also an intercranial finding under the bone. And then, he was also noted to have multiple injuries, multiple superficial injuries or skin injuries to his body." Ms. Donnell testified that Defendant's mother and her husband were in the room when she evaluated the victim. She noted that the victim had been hospitalized at Vanderbilt for three days at that time and had visible injuries to his face.

Ms. Donnell testified that she completed a six-page "care consultation note" concerning the victim. Her notes indicated that the victim cried when she touched the scalp on the left side of his head which was consistent with a skull fracture to the area. She said that the victim had a "purplish curvilinear" bruise on the outside of his left ear, multiple ulcerations to his tongue, and a healing laceration to the inside of his lower lip. The victim told Ms. Donnell that the injury to his mouth occurred when Defendant held his hand over the victim's mouth while the victim's mother was at work, and the victim bit his tongue. Ms. Donnell testified that there was an abnormal finding on the exam of the victim's collar bone and that a CT scan showed the victim had a healing fracture to his collar bone which was at least two weeks old.

Concerning the victim's injuries, Ms. Donnell observed bruises to the victim's left forehead, left temple, and area around his right eye. He also had a "lateral subconjunctival hemorrhage" to his right eye. Ms. Donnell testified that there was a healing abrasion over the victim's right eyebrow, and a bruise to his right temple. The victim also had bruises on both forearms, the backs of both shoulders, his right hip, and his lower back just above the buttocks. Concerning the victim's bruises, Ms. Donnell testified: "It's highly concerning, due to the number and the location on the body. And they're in locations that are not typically associated with accidental injury."

Ms. Donnell testified that further imaging of the victim was obtained, and it was discovered that there were injuries to his lower leg and forearm that were at least two weeks old. She agreed that those injuries were not present when imaging was obtained on the victim during a hospital visit in December 2016. Therefore, the injuries would have occurred sometime between December 2016 and March 2017. Ms. Donnell testified that imaging showed the victim had what appeared to be a "subacute hematoma of the liver," but it was impossible to give an accurate date of when that injury occurred. There was also evidence of elevated liver enzymes which correlated with an injury to the victim's liver. Ms. Donnell said, "Outside of a major catastrophic accident . . . it's very, very rare to see an abdomen injury in a young child." She noted that it would not be caused by a trip or fall. She testified that the injury was potentially life-threatening. Ms. Donnell further said:

We see these injuries accidentally when a child has a car accident, and the seatbelt . . . forcefully traumatizes the abdominal region. Or if a child, who is riding his bike, has a bike accident and a protruding object, like the handle bars protrudes into the abdomen. When we see, but outside of those major accidents, when we see it abusively, it's typically from a kick or punch to that area.

Concerning the victim's skull fracture, Ms. Donnell testified that there was a fracture of the left side of the victim's skull and bleeding under the lining of his brain. She said that this appeared to be a new injury. When asked why the injury was concerning, Ms. Donnell testified:

Because of the, just the presentation of a child this age, it's unusual outside of infancy. Sometimes we see accidental injuries which cause a skull fracture. But in the context of all of the other injuries and the delaying in seeking care, there was concern that this occurred abusively, and indicates that there was trauma to the skull.

Ms. Donnell testified that the skull fracture was also a potentially life-threatening situation. She said that the injuries to the victim's skull and liver could have caused extreme physical pain and resulted in a protracted loss of a substantial impairment of a function of a bodily member. Ms. Donnell asserted that all of the victim's injuries would have been painful.

Ms. Donnell testified that during a conversation with the victim, he told her that he urinated on himself after Defendant placed him in the corner as punishment. The victim told her that the injury to his back was caused by his falling off of the firetruck and that he also got stuck in a couch. Ms. Donnell asked the victim how he injured his head, and he said, "I hurt myself. I got a big owie on my head. I hurt myself a lot." She said that he repeatedly said, "I hurt myself a lot." Ms. Donnell further testified:

When I asked what happened after he hurt his head, he said Mommy and daddy were checking on me. I asked him about his bruising on his right hip and he said, I hurt myself. I asked who was there when he hurt himself, and he said, Mommy and Daddy. Again, the bruising on his back, he said, I hurt myself. When I get in trouble, pee on myself. And I asked when that happens, and said, When daddy gets onto me. And I asked what he does, he said, quote, Whoops my butt. And I ask what he whoops his butt with? And he said, with a belt.

Ms. Donnell agreed that she occasionally encountered children who had accidental injuries. She said that member of the CARE Team also saw the victim in December 2016.

- 9 -

He had a skull fracture at the time and bruises to the back of his body. She testified: "After it had been investigated, there were concerns about how it occurred, but it had been investigated and felt that it was likely accidental. However, the bruises to the back of the body were consistent with an inflicted injury." Ms. Donnell testified that based on the totality of the circumstances in March 2017, including the victim's injuries and the explanation for the injuries, it was her opinion that he had been the "victim of child physical abuse on more than one occasion and more than one way. And that he had also been the victim of medical neglect, due to medical care not being sought for his numerous injuries."

On cross-examination, Ms. Donnell testified that she was part of the case review involving the victim in December 2016 but she was not the provider who consulted and initially saw the victim at the hospital. She said: "DCS was notified and it was recommended that an investigation take place to determine whether what had been reported as happening did, in fact, happen. But as it was described, it was, the determination that it could have been accidental based on the history that was given." She agreed that on March 20, 2017, the victim repeatedly said that he hurt himself. Ms. Donnell also agreed it was possible for a skull fracture to occur from a fall. She said that the laceration to the victim's lip was traumatic in nature and consistent with Defendant holding his hand over the victim's mouth. She agreed that the ulcerations on the victim's tongue could have been fungal or bacterial in nature and that it was possible for someone to bite their lip during a fall. Ms. Donnell testified that the injuries to the victim's forearm, collarbone, and leg would have occurred after the December 2016 injury. She agreed that a collarbone injury could be caused from a fall and that an injury to a collarbone, leg, or forearm could be caused by a fall on a creek bank. However, she testified that all of those injuries would not occur in one fall.

Ms. Donnell testified that the Defendant and the victim's mother provided a history of the victim falling off a fire truck, falling off a step, and "falling on to paving stones two days prior." When asked if falling off paving stones or a deck would cause injuries to the victim's eye and collarbone, Ms. Donnell said:

> It could cause one of those injuries, depending on how the child fell. It wouldn't have caused, just to be clear, it wouldn't have caused this clavicle fracture, as it was healing, so the time line would have been off. That would not have accounted, that particular fall two days prior would not have accounted for this clavicle fracture.

Ms. Donnell agreed that the fall could have caused the victim's black eye. When asked if she could rule out all of the victim's injuries as being caused by an accident, Ms. Donnell testified:

> [B]ased on the history provided, there, that history, the histories that were provided would not account for the constellation of findings

that child had. Each injury taken in isolation could be potentially from an accident, except for the abdominal injury with, there, I can't conceive of a situation where there wasn't a significant accident that someone would have been aware of.

Ms. Donnell agreed that an item with a protruding end could have caused injuries to the victim's abdomen or liver, but she said that such an injury could not have been caused by an action figure. She was not provided with any information that the victim had jumped off the couch onto an action figure. She said that none of the victim's injuries could have been caused from getting stuck in a couch.

Ms. Donnell agreed the victim said that Defendant and the victim's mother checked on him when he was injured. She said that the head injury in December 2016 and the head injury in March 2017 could not have been from the same incident because the blood from the injury in March was new, and the fracture was in a different location than the December one. Ms. Donnell noted that the skull fracture from December had fully healed by the time the victim saw the neurologist in March. She did not feel that the victim's hitting his head on the wall during time-out would have caused a skull fracture or other "brain-type injury." She also did not feel that any of the victim's injuries were self-inflicted. Ms. Donnell said that the injuries to the victim's leg, collarbone, and forearm could have been caused by jumping off of something. She agreed that a single bruise can be caused by "rough housing," but the victim's multiple injuries to the entire body were concerning. She said that Defendant's mother never told her that the victim tended to injure himself. Defendant's mother only told her that the victim was "very active and what he was capable of, which is walking, running, climbing and jumping."

Ms. Donnell testified that she could not "date bruising with any degree of medical certainty." She was concerned that the victim's bruises occurred at different times because "some bruises to some parts of the body had different colorations, which would indicate potentially that they had occurred at different times."

*Defendant's Proof*

Carlin Irvin, Defendant's mother, testified that the victim was placed with her and her husband by Defendant and the victim's mother through their agreement with the DCS, and she and her husband picked the victim up from the hospital. They had custody of the victim for a couple of months until he went to live with his father in California. Ms. Irvin testified that she was questioned at the hospital about Defendant and his relationship with the victim. Someone from DCS later came to her home to do a home study. Ms. Irvin testified that the victim told her that he injured his head by taking "the little red fire engine and pushed it up against the wall and piled toys and climbed up and jumped off of the toys." Neither Defendant nor the victim's mother were present when the victim told Ms.

Irvin about the injury.  Ms. Irvin took the victim to the forensic interview, but she was not allowed to be present in the room.

Ms. Irvin testified that she had a good relationship with the victim, and he was a "very energetic three-year-old."  She noted that he was also very curious, liked to explore, and climbed on things.  More specifically, Ms. Irvin testified:

> He liked to take and jump, push toys together and climb on top of them and jump off.  He liked to jump off the front porch.  He liked to get on the couch and jump off of there.  Anything that he could make a little mound out of, he would try.

Ms. Irvin agreed that the victim liked martial arts movies and would demonstrate those type of moves.  She said that he was verbal and seemed intelligent.  Ms. Irvin testified that she took the victim to the emergency room on one occasion after he jumped off the porch and hit his head on the sidewalk.  She insisted on a CT scan before they left the hospital. The victim did not have any serious injuries, and she was instructed to give him Tylenol. Ms. Irvin testified that the victim sometimes lied, and she punished him by having him sit in "time out."  She said that she contacted the victim's father through Facebook to let him know that she had custody of the victim.

Ms. Irvin testified that the victim would harm himself by hitting various parts of his body with toys, including action figures.  She said that she also witnessed him strike his head against the wall while sitting in "time out."  Ms. Irvin testified that she attempted to get help for the victim due to the self-harming behavior, but he did not qualify for anything because he was never in State's custody.  Ms. Irvin testified that Defendant seemed to have a good relationship with the victim, and she never observed any concerning behavior when he was around the victim.  She also said that the victim appeared to love Defendant.

On cross-examination, Ms. Irvin testified that she had seen the victim a total of two times, the last being around Christmas of 2016, before taking custody of him.  Defendant and the victim's mother informed her that the victim had a skull fracture.  She denied telling medical personnel that Defendant and the victim's mother told her that they did not know how the fracture occurred or how the victim obtained a black eye.  Ms. Irvin agreed she told medical personnel that Defendant and the victim's mother were too strict with their children, but she denied saying that they put the children in time-out for five to ten minutes, which was too long.  Ms. Irvin further denied telling medical personnel that Defendant took care of disciplining the victim and the victim's mother took care of disciplining Defendant's daughter, and that parents discipline step-children more than their own biological children.

Terri Nelson, an employee of DCS, testified that she worked on a case involving Defendant's daughter in order for the child's mother to establish visitation with the child.

She also observed Defendant and the victim together several times during her visits to Defendant's home, and she did not observe any concerning behavior. She noted that Defendant and the victim appeared to have a "bond" and a healthy relationship. Ms. Nelson testified that she observed Defendant punish the victim by placing him in time-out or verbally reprimanding him. She did not notice anything inappropriate.

Mark Irvin, Defendant's step-father, testified that the victim was a "very active, ambitious kid" who like to climb on and jump off of toys and furniture, which concerned Mr. Irvin. He noted that the victim also liked to "roughhouse" with his step-sister, and the victim enjoyed watching wrestling and martial arts movies. Mr. Irvin testified that he helped transport the victim to the forensic interview, but he did not tell the victim what to say during the interview. He said that the victim never disclosed how he injured his head. Mr. Irvin testified that he was around Defendant and the victim two times prior to taking custody of the victim. Defendant and victim seemed to have a good relationship and both were affectionate toward one another. He had observed the victim harming himself by banging his head against the walls and hitting himself in his "private parts" with toys. Mr. Irvin testified that he never saw any bruising on the victim as a result of the self-harming behavior.

On cross-examination, Mr. Irvin testified that he did not see the victim from Christmas of 2016 until March 20, 2017, when he and Mrs. Irvin picked the victim up from the hospital. He had no knowledge about the interactions of Defendant and the victim during that time.

Based on this evidence, the jury convicted Defendant of aggravated child abuse and aggravated child neglect. The trial court imposed a sentence of twenty-two years for each count to be served concurrently for an effective twenty-two-year sentence to be served as a Range I standard offender at 100 percent, by operation of law, in the Department of Correction. It is from these judgments that Defendant now appeals.

## Analysis
### I. Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his conviction for aggravated child abuse because the victim's injuries and the testimony as to how those injuries occurred were inconsistent. Defendant also contends that the evidence was insufficient to support his conviction for aggravated child neglect because the State did not show that Defendant's "conduct produced an actual, deleterious effect or harm upon the child's health or welfare." The State asserts that the jury accredited the State's proof as to how the victim's injuries occurred and that the proof also supported the jury's finding that the victim suffered "serious bodily injury separate from the serious bodily injury to support the abuse conviction." Therefore, the evidence was sufficient to support Defendant's convictions.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether *any* rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

> T.C.A. § 39-15-402(a) provides:
> A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and ... [t]he act of abuse, neglect or endangerment results in serious bodily injury to the child[.]

T.C.A. § 39-15-402(a)(1).

Child abuse is defined as "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury[.]" T.C.A. § 39-15-401(a). Child neglect is "knowingly abus[ing] or neglect[ing] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare[.]" T.C.A. § 39-15-401(b). Child abuse, neglect, or endangerment becomes aggravated when the "act of abuse, neglect or endangerment results in serious bodily injury to the child[.]" T.C.A. § 39-15-402(a)(1). "Serious bodily injury to the child" includes, but is not limited to, the following: "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted

- 14 -

disfigurement, including those sustained by whipping children with objects." T.C.A. § 39-15-402(c). "Serious bodily injury" is further defined as an injury involving: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme Physical Pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(36). If the victim is under the age of eight years old, aggravated child abuse or neglect is a Class A felony. T.C.A. § 39-15-402(b).

Convictions for both aggravated child abuse and aggravated child neglect require "some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse." *State v. Wanda Elaine Brock*, E2009-99785-CCA-R3-CD, 2011 WL 900053, at \*6 (Tenn. Crim. App., at Knoxville, Mar. 16, 2011), *no perm. app. filed*.

The evidence viewed in a light most favorable to the State showed that victim, who was three years old at the time of the offenses and six-years-old at the time of trial, was transported to Vanderbilt Children's Hospital for injuries consisting of a skull fracture, a subdural hematoma, and a subacute hematoma on his liver. He spent a total of three days in the hospital. The victim remembered going to the hospital because he was hurt and that he got hurt because Defendant "punched me and kicked me a lot." The victim said that Defendant got mad because the victim was doing "bad stuff" and that Defendant "beat me up really bad . . .because he was really mad at me." The victim also said that Defendant hit him in the stomach. He did not believe that his head was hurt but he had a black eye, and Defendant caused his black eye by "punching me a lot." The victim did not tell his mother about the abuse because he was afraid that she would be angry. Although the victim's mother initially told hospital staff and police that she was present when the victim fell and injured himself on two occasions, she testified at trial that she was not there when the injuries actually occurred and that Defendant had asked her to lie on his behalf and say that she was present.

According to Ms. Donnell, the nurse practitioner who evaluated the victim at Vanderbilt, the injury to the victim's liver was rare and usually only seen in a "major catastrophic accident" and that the injury was potentially life-threatening. She said that the injury would not be caused by a trip or fall, and was more commonly seen in car or bicycle accidents. Otherwise, the injury would have been caused by a "kick or punch to that area." Ms. Donnell noted that the victim's skull and liver injuries posed a substantial risk of death; would have caused extreme physical pain; and could have resulted in a substantial impairment of a body member. She said that the victim cried during her evaluation of him at Vanderbilt when she touched the scalp on the left side of his head. Ms. Donnell testified that the victim's head injury was new, and the injury to his liver did not appear to be new, but that it was almost impossible to date that type of injury. She said that the victim's liver injury correlated with his abdominal bruises and elevated enzyme levels.

- 15 -

There were also bruises on multiple areas of the victim's body which Ms. Donnell found "highly concerning" because they were in areas "not typically associated with accidental injury." There was also an injury to the victim's mouth and multiple lacerations to his tongue. The victim testified that Defendant placed his hand over the victim's mouth causing the victim to bite his tongue. It was Ms. Donnell's opinion, based on the totality of the victim's injuries and his history, that the victim had suffered physical abuse on more than one occasion. She did not believe that the victim's liver injury was self-inflicted and she was not provided with any history that supported a finding that the injury was accidental. It was Ms. Donnell's assessment that "the extent and force required to inflict all of these injuries is not consistent with accidental causes or daily activities."

The proof showed that Defendant did not seek immediate medical treatment for the victim's injuries. The victim's mother testified that she was at work on March 17, 2017, when Defendant texted her and said that the victim had fallen. Defendant told her that he gave the victim an icepack and some Tylenol and that there was no need for her to come home from work. When the victim's mother arrived home after her workday, she noticed that the victim was wearing a toboggan and she discovered that his head was swollen. She also noticed that the victim "was a little out of it" and "not acting normal." The victim's mother testified that on a previous occasion, March 8, 2017, Defendant had texted her while she was at work and said that the victim had fallen off the porch. Defendant also told the victim's mother on that occasion that she did not need to come home from work. The victim was not taken to the hospital immediately after that injury. In addition to the injuries to the victim's liver and skull, there were injuries to the victim's lower leg and forearm, and a healing fracture to his collarbone that were at least two weeks old. Ms. Donnell testified that the totality of the victim's injuries would have caused extreme pain. In fact, the victim's mother told Detective Nichols that the victim on one occasion said that his shoulder hurt as Defendant was taking him out of the car seat. The victim's father testified that the victim had developed a "tic in his hand with a little shake," and he was under the care of a neurologist at the time of trial.

From this evidence, a reasonable jury could find that Defendant punched and kicked the victim causing life-threatening injuries to the victim's skull and liver which supported Defendant's conviction for aggravated child abuse. The jury could have further found that the totality of the victim's injuries, and the delay in seeking medical care for those injuries, resulted in extreme physical pain to the victim and impairment of a bodily function which supported Defendant's conviction for aggravated child neglect. Although there were inconsistencies in some of the proof, the jury resolved those inconsistencies in favor of the State, and "we will not second-guess the jury in the resolution of any conflicts in the proof." *State v. Michael Wayne Robinson, Jr.*, No. W2019-00216-CCA-R3-CD, 2019 WL 6876778, at *5 (Tenn. Crim. App., at Jackson, Dec. 16, 2019), *no perm. app. filed*. Furthermore, the jury was free to reject Defendant's theory that the victim's injuries were accidental or self-inflicted given the victim's mother's testimony that Defendant asked her to lie and say that she was present when the victim's injuries occurred. *State v. Marable*,

203 Tenn. 440, 457 (1958) ("Any ex post facto indication by accused of a desire to evade prosecution may be shown as one of series of circumstances from which guilt may be inferred."); *Tillery v. State*, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978) ("Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred."). Defendant is not entitled to relief on this issue.

## II.     Unanimous Verdict

Defendant argues that his convictions for aggravated child abuse and aggravated child neglect should be overturned because the State's election of offenses was not sufficient to ensure a unanimous verdict. The State asserts that the State's election was sufficient and did not result in a patchwork verdict.

Where there is evidence at trial that the defendant has committed multiple offenses during a time period alleged in a single count of an indictment or presentment, the doctrine of election requires the State to elect the facts upon which it is relying to establish a charged offense. *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). "The election requirement safeguards the defendant's stated constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Id.* at 631 (citing *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)).

Because the election requirement is "fundamental, immediately touching the constitutional rights of the accused," an election of offenses is mandated whether or not the defendant requests an election. *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Rather, it is incumbent upon the trial court even absent a request from the defendant to ensure that the State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993).

The trial court had several discussions with the parties about election of offenses, and the State indicated its election for count one, aggravated child abuse, would include the skull fracture, subdural hematoma and liver hematoma. The trial court ruled that those injuries arose from a kick or punch to the head and stomach of the minor child. The trial court further ruled that no election was required for count two, aggravated child neglect, because the allegation was of neglect for a continuing course of conduct resulting in adverse effects to the victim's health or welfare. Consistent with the trial court's ruling, the State argued in it closing argument that count one dealt with the serious bodily injuries of the skull fracture, subdural hematoma, and laceration to the liver to support the charge of aggravated child abuse in count one. The State further argued that Defendant's charge of aggravated neglect in count two consisted of all the victim's injuries and Defendant's neglect in seeking medical treatment for the victim's injuries. The State argued to the jury

that Defendant inflicted the victim's injuries and that the jury should not consider the causation of the victim's injuries in insolation but view them in totality.

Defendant did not dispute the victim's injuries in his closing argument but argued that "there has been reasonable doubt shown through every witness that the injuries have been explained, not only through doctors, but when the child testified." Defendant further argued that the proof weighed in favor of the victim's having inflicted his own injuries.

As to Defendant's aggravated child abuse charge, the trial court instructed the jury as follows:

> The State has elected to submit for your consideration the alleged act of the Defendant [. . .] kicking or punching the minor child [. . .]in the head and stomach, allegedly causing a skull fracture, a subdural hematoma, and/or liver hematoma, occurring on divers days between March 8, 2017 through March 17, 2017.

> Members of the jury, you are to consider only this alleged act in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offenses charged and included in Count one.

As to the charge of aggravated child neglect, the trial court charged the jury that neglect "is a continuing course of conduct beginning with the first act or omission that causes adverse effects to a child's health and welfare, and can be an act of commission or omission."

We agree with the State that given the jury charge in this case, there was no chance for anything other than a unanimous jury as to both counts. As to the aggravated child abuse charge, the jury was instructed to consider only one act, the kicking or punching of the victim in the head and stomach. Concerning the aggravated child neglect charge, the jury was properly instructed that it could consider all of the victim's injuries in deciding whether Defendant had neglected the victim resulting in adverse effects to his welfare. *See State v Adams*, 24 S.W.3d 289, 296 (Tenn. 2000) (multiple discrete acts could constitute a single act of neglect "where a single scheme or motivation is present"); *State v. Pewitte*, No. M2015-02103-CCA-R3-CD, 2016 WL 6678534, at *4 (Tenn. Crim. App., at Nashville, No. 14, 2016) ("there was no need for an election of offenses because the neglect charges were predicated upon a single, continuing course of conduct, and therefore, the evidence only suggested a single criminal offense of neglect"), *perm. app. denied* (Tenn. Mar. 8, 2017).

In this case, given the State's theory and the proof presented at trial, there was no danger that the jury would return a "patchwork verdict" that was not based upon a

unanimous decision of the offenses for which the jury found Defendant guilty. Defendant is not entitled to relief on this issue.

### III. Admission of the Forensic Interview

Defendant argues that the trial court erred by admitting the victim's forensic interview as substantive evidence at trial. More specifically, he contends that the qualifications of Ms. Turner, the forensic interviewer, were inadequate and that there was a lack of statutory relevance in accordance with Tennessee Code Annotated Section 24-7-123. The State responds that this issue is waived and that any error in admitting the interview was harmless.

Initially, as pointed out by the State, Defendant failed to object to the admission of the forensic interview at trial. Therefore, this issue is waived. Tenn. R. App. P. 3(e), 36(a); *See State v. Gilley,* 297 S.W.3d 739, 762 (Tenn.Crim.App.2008) ("The failure to make a contemporaneous objection constitutes waiver of the issue on appeal."); *State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000) (defendant's failure to object to otherwise inadmissible evidence renders the evidence admissible); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (defendant's failure to make a contemporaneous objection to the admission of the evidence resulted in waiver of the issue on appeal); *State v. Joseph Lester Haven*, W2018-01204-CCA-R3-CD, 2020 WL 3410242, at *10-11 (Tenn. Crim. App., at Jackson, June 19, 2020) (defendant failed to object to the admission of the video of the forensic interview in its entirety, and "the [d]efendant cannot now claim that the video evidence is not part of the record before us."), *perm. app. denied* (Tenn. Oct. 12, 2020).

In any event, even if the forensic interview were improperly admitted into evidence, any error was harmless. *See* Tenn. R. App. P. 36(b). We review improperly admitted evidence under a non-constitutional harmless error analysis. *State v. Jeff Carter*, No. 2009–02399–CCA–R3–CD, 2010 WL 5343212 at *13 (Tenn. Crim. App., at Nashville, Dec. 16, 2010) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003)), *no perm. app. filed*. In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *State v. Rodriguez,* 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict [wa]s correct." Id. at 372. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." *Id.*

In this case, none of the statements in the forensic interview were so prejudicial that they more probably than not affected the jury's decision making. As pointed out by the State, Defendant's entire case was centered on undermining the victim's credibility. Defendant's theory, as set forth in his closing argument, was that the victim had given inconsistent statements regarding his injuries and that the victim inflicted his own injuries. In making his argument, Defendant relied on parts of the forensic interview where the victim said that he hurt his eye with a toy gun, fell on his toy fire truck and that he trusted his mother and father. *See State v. Danny Ray Smith*, No. M2009-02275-CCA-R3-CD, 2011 WL 1432033, at *14-15 (Tenn. Crim. App., at Nashville, Apr. 13, 2011) (defendant's use of contested evidence to his advantage undermined his claim of prejudice), *perm. app. denied* (Tenn., Aug. 25, 2011). Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____

JILL BARTEE AYERS, JUDGE